Filed 4/9/26  P. v. Martin CA2/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B327394 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA005658) |
| v. | |
| LUCIEN MARTIN, | |
| Defendant and Appellant. | |

APPEAL from a postjudgment order of the Superior Court of Los Angeles County.  Mike Camacho, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————————

Lucien Martin filed a petition for resentencing under Penal Code[1] section 1172.6 (former § 1170.95[2]).  Following an evidentiary hearing, the superior court denied the petition.  We previously affirmed the ruling, determining that the record of appellant's trial contained substantial evidence to support the superior court's analysis under *Banks* and *Clark*[3] that appellant acted with reckless indifference to human life.  (See *People v. Martin* (June 18, 2024, B327394) [nonpub. opn.].)

The Supreme Court granted a petition for review filed by petitioner and subsequently transferred the matter back to this court "with directions to vacate its decision and reconsider the cause in light of *People v. Emanuel* (2025) 17 Cal.5th 867 [(*Emanuel*)]."  In supplemental briefing (see Cal. Rules of Court, rule 8.200(b)), appellant argues that *Emanuel* provides further support for his contention that the superior court erred by finding that he acted with reckless indifference to human life.  We disagree and affirm the superior court's order.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text.  (Stats. 2022, ch. 58, § 10.)

[3] *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*); *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

## FACTUAL AND PROCEDURAL BACKGROUND[4]

*The robberies and murder*

In the early morning hours of July 17, 1990, appellant and his cousin, Paul Watkins, engaged in a string of armed robberies during which one of the victims was shot and killed. Appellant supplied the large nine-millimeter semiautomatic pistol with a "banana style" magazine containing over 17 live rounds, which was wielded in each of the robberies.

Around 3:30 a.m., Anthony Orosco and Juan Gallegos were sitting in Orosco's black Nissan pickup truck in the parking lot of an AM-PM Mini-Mart in Riverside. Orosco heard someone, later identified as Watkins, say "get the fuck out of the truck," and was simultaneously struck in the temple with the gun by Watkins, before Orosco saw either of the perpetrators. Leaving the keys in the ignition, Orosco exited the truck as Watkins continued to point the gun at him. Watkins then told Orosco to "get the hell out of here."

In the meantime, appellant went to the passenger side of the truck where Gallegos was seated. After Gallegos exited the vehicle, appellant took Gallegos's wallet and a gold chain with an engraved heart. Orosco and Gallegos then watched as Watkins jumped into the truck bed and appellant got into the driver's seat and drove away. Appellant stopped at a gas station to allow Watkins to enter the passenger seat in the cab before continuing on the freeway to the next robbery.

---

[4] The following factual summary is based on the clerk's and reporter's transcripts from appellant's trial, which were lodged with this court in connection with respondent's request for judicial notice of the records in *People v. Lucien Martin*, Second Appellate District No. B069142.

3

Sometime before 5:00 a.m., appellant pulled the truck into a Greyhound bus station in Claremont where Jihad Muhammed was standing alone waiting for a bus. Appellant stopped next to Muhammed. Without exiting the vehicle, Watkins pulled out the gun, pointed it at Muhammed, and demanded his money. Muhammed threw about $12 in cash into the truck, and appellant drove away.

Appellant then drove to a Holiday Inn in West Covina where he and Watkins had decided to commit another robbery. As they pulled into the driveway shortly after 5:00 a.m., while it was still dark, they saw Raymond Shield and his family in front of the hotel unloading luggage from a car to the sidewalk. Appellant parked the truck nearby and popped the hood. As he and Watkins quickly hopped out, Watkins tucked the gun into his waistband. They hurried to the front of the truck, opened the hood, and looked inside as if they were having engine trouble.

Watkins waved at Shield, who nodded and smiled. Shield walked over to the truck and offered to help. He stood with appellant and Watkins for about a minute as he appeared to look at the engine. Shield then hurried away from the truck toward his family. Fearing that Shield was going to call the police, appellant and Watkins immediately put the hood down and rushed to the cab of the truck. Appellant returned to the driver's seat as Watkins got in on the passenger side. The passenger door remained open. Before pulling both legs into the truck, and while facing outward, Watkins took the gun from his waistband and fired a single fatal gunshot at Shield, who was about four or five steps away from the truck. Shield fell to the ground, and the truck sped away, tires screeching, with appellant at the wheel. The passenger door closed as the truck was accelerating.

4

After fleeing the scene of the murder, appellant drove to Gardena, a 35-minute drive from West Covina. There, he and Watkins decided to commit another robbery. Either appellant or Watkins entered Steve's Market around 8:45 a.m., approached the counter, and asked Kyung Sun Lee, the store's owner, for a pack of cigarettes. Lee responded that they cost $1.95 and put a pack on the counter. Saying he needed to get another dollar, the man walked out to a truck parked in front of the store. Lee watched appellant and Watkins speaking, and then saw the driver load a magazine into a gun. Lee hid behind a counter as appellant and Watkins returned to the market. One man took money from the cash register and picked up the cigarettes while the other stood at the store entrance pointing his gun toward the register.[5] Lee then pulled out his own handgun and fired. The man holding the gun dropped the gun's magazine on the floor before both perpetrators fled in opposite directions.

### *Appellant's conviction*

Appellant was convicted by jury in 1992 of the first degree murder (§ 187, subd. (a), count 1) and attempted robbery (§§ 664/211, count 2) of Shield, the second degree robbery of Muhammed (§ 211; count 3), the second degree robbery of Lee (§ 211; count 4), and the second degree robberies of Orosco (§ 211; count 5) and Gallegos (§ 211; count 6). The jury found that the murder occurred during the commission of an attempted robbery. (§ 190.2, subd. (a)(17).) As to all counts, the jury found true the

---

[5] Lee testified at trial that Watkins was the gunman, though he earlier testified that appellant held the gun. Watkins, who testified in his own defense at trial, acknowledged wielding the gun in all the other encounters, but testified that appellant held the gun at Steve's Market.

allegation that a principal was armed with a firearm in the commission of the crime. (§ 12022, subd. (a)(1).) The trial court sentenced appellant to state prison for a term of life without the possibility of parole plus one year for the murder, to be served consecutively with the determinate term of nine years eight months on counts 3, 4, 5, and 6.

This court affirmed the judgment in appellant's direct appeal. (*People v. Martin* (June 23, 1994, B069142) [nonpub opn.].)

### *Section 1172.6 petition and appellate proceedings*

Appellant filed a petition for resentencing pursuant to section 1172.6. The superior court found a prima facie case for relief had been made, issued an order to show cause, and held an evidentiary hearing in accordance with section 1172.6, subdivision (d). At the hearing, the superior court noted that the prosecution had the burden of proving beyond a reasonable doubt that appellant could be convicted of murder on a theory that remains valid under current law. It further recognized its duty to sit as an independent trier of fact. To that end, the court stated it had "spent substantial time reviewing the record in the case," and had "a good grasp of the facts" and the evidence.

The prosecution argued appellant is liable for murder under current law as a direct aider and abettor to the murder and also under a felony-murder theory as a major participant in the attempted robbery of Shield who acted with reckless indifference to human life. When the defense argued, the court asked counsel to focus on why appellant should not be found liable under a felony-murder theory as a major participant who acted with reckless indifference to human life pursuant to *Banks* and *Clark*. The defense conceded that appellant was a major

6

participant in the attempted robbery of Shield as well as the other robberies, but asserted there was no evidence appellant acted with reckless indifference to human life, arguing that: appellant did not encourage Watkins to shoot or otherwise actively participate in the murder; given Watkins's conduct during the previous robberies, appellant could not have anticipated that Watkins would shoot anyone when the men attempted to rob Shield; and "the only thing [appellant] did . . . was leave the scene, get in the driver's seat, and drive away" with his cousin in the car.

The superior court denied the petition. It rejected the People's argument that appellant could be convicted of the murder under a theory of direct aiding and abetting, but analyzing the evidence under *Banks* and *Clark*, the court found appellant guilty of felony murder under current law. In so ruling, the court emphasized appellant's role in supplying the weapon used to kill Shield, Watkins's use of this very large, loaded gun to threaten the victims in each of the robberies, appellant's failure to do anything in the aftermath of the shooting but help Watkins to escape, and appellant's commission of yet another robbery using the same loaded firearm immediately after the murder. On the strength of this evidence, the court declared, "[A]pplying the *Banks* and *Clark* analysis, it was clear[] that [appellant] was a major participant, [and] acted with reckless indifference to human life." Finding appellant ineligible for relief under section 1172.6, the superior court denied appellant's petition for resentencing.

This court affirmed the superior court's order denying the section 1172.6 petition. (*People v. Martin*, *supra*, B327394.) In August 2024, the Supreme Court granted a petition for review

7

and later transferred the case with directions for us to vacate our prior opinion and reconsider the cause in light of *Emanuel, supra*, 17 Cal.5th 867.

## DISCUSSION

Throughout these appellate proceedings, appellant has not challenged the superior court's finding that he was a major participant in the attempted robbery and murder of Shield. Instead, appellant asserts that there is no substantial evidence that he acted with reckless indifference to human life. We previously rejected this argument, as well as a related claim that any failure on the part of the superior court to consider appellant's youth constituted reversible error. (*People v. Martin, supra*, B327394.)

Pursuant to Supreme Court direction, in light of *Emanuel* we reconsider our prior conclusion that substantial evidence supports the determination that appellant acted with reckless indifference to human life. Appellant argues in his supplemental briefing that the *Emanuel* decision weighs against the superior court ruling. In particular, appellant asserts that the record does not establish that he consciously disregarded the significant risk of death his actions created, that his part in planning the armed robberies did not show reckless indifference to human life, and that his failure to restrain Watkins or aid the murder victim was insufficient to prove reckless indifference to human life.

Considering all relevant factors, and examining the totality of the evidence, we affirm the superior court order.

A.   **Prevailing Law**

1.   **Section 1172.6**

Effective January 1, 2019, Senate Bill No. 1437 was enacted by the Legislature " 'to amend the felony murder rule

8

and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill [No.] 1437 added section [1172.6], which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 959.) Specifically with regard to felony-murder liability, Senate Bill No. 1437 amended section 189, subdivision (e) to add the requirement that a defendant who was not the actual killer or a direct aider and abettor with the intent to kill must have been a major participant in the underlying felony who acted with reckless indifference to human life. (*People v. Strong* (2022) 13 Cal.5th 698, 707–708.)

Once a defendant convicted of murder under the old law has filed a facially sufficient resentencing petition under section 1172.6, the superior court must determine whether the petitioner has made a prima facie showing of eligibility for relief, and, if so, the court issues an order to show cause. (§ 1172.6, subd. (c); *People v. Wilson* (2023) 14 Cal.5th 839, 869 (*Wilson*); *People v. Nieber* (2022) 82 Cal.App.5th 458, 469–470.)

The superior court then conducts an evidentiary hearing to determine whether the petitioner is entitled to relief. (§ 1172.6, subd. (d)(1).) At that hearing, the superior court sits as the trier of fact, and the burden of proof rests with the prosecution " 'to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under the law as amended by

Senate Bill [No.] 1437 (§ 1172.6, subd. (d)(3)).ˮ (*Wilson, supra*, 14 Cal.5th at p. 869.)  "[T]he court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed."  (§ 1172.6, subd. (d)(3).)  "In addition to evidence admitted in the petitioner's prior trial, both '[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.'  ([§ 1172.6, subd. (d)(3)].)  'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.'  (*Ibid.*)ˮ  (*Wilson*, at p. 869; *People v. Hill* (2024) 100 Cal.App.5th 1055, 1065–1066 (*Hill*).)

### 2.  *Banks* and *Clark*

Consistent with Senate Bill No. 1437, a person convicted of first degree murder on the theory that he aided and abetted an enumerated felony that resulted in death and who was not the actual killer may only be sentenced to life without the possibility of parole if he either acted with the intent to kill (§ 190.2, subd. (c)), or if he was "a major participant" and acted "with reckless indifference to human life" (§ 190.2, subd. (d)).  These elements were designed to codify the holdings of *Tison v. Arizona* (1987) 481 U.S. 137 [107 S.Ct. 1676, 95 L.Ed.2d 127] (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 782 [102 S.Ct. 3368, 73 L.Ed.2d 1140] (*Enmund*).  (*Banks, supra,* 61 Cal.4th at p. 794.)  *Banks* explained that *Tison* and *Enmund* "collectively place conduct on a spectrum" (*Banks* at p. 794), and that the defendant's "*personal* role in the crimes leading to the victim's death" must be examined (*id.* at p. 801).

In *Banks*, our Supreme Court identified several factors to consider when a court determines whether a defendant was a major participant " 'in criminal activities known to carry a grave risk of death.' " (*Banks, supra,* 61 Cal.4th at p. 803.) With respect to the requirement of reckless indifference to human life, the defendant must have " 'subjectively appreciated' " that his acts " 'were likely to result in the taking of innocent life.' " (*Banks*, at pp. 801–802, quoting *Tison, supra*, 481 U.S. at p. 152.)

A year after *Banks*, the high court in *Clark, supra,* 63 Cal.4th at pages 614–623, provided further guidance for determining whether a defendant acted with reckless disregard for human life. *Clark* explained that the required mental state "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) According to *Clark*, reckless indifference has "both subjective and objective elements." (*Ibid.*) "The subjective element is the defendant's conscious disregard of risks known to him or her." (*Ibid.*) With respect to the objective element, " '[t]he risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Ibid.*, quoting Model Pen. Code, § 2.02, subd. (2)(c); see also *In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

The specific factors referenced in *Clark* as relevant to the determination of whether a defendant acted with reckless disregard for human life are: (1) the defendant's awareness that a weapon would be used and his personal use of a weapon; (2) the

defendant's "[p]roximity to the murder and the events leading up to it"; (3) the duration of the crime and any restraint of the victims; (4) whether the defendant had "advance notice" that an associate was likely to kill; and (5) whether the defendant "engaged in efforts to minimize the risk of violence in the felony." (*Clark, supra*, 63 Cal.4th at pp. 618–623; see also *Hill, supra,* 100 Cal.App.5th at pp. 1074–1075.) In both *Banks* and *Clark*, our Supreme Court emphasized that " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at p. 618, quoting *Banks, supra*, 61 Cal.4th at p. 803.)

### 3. *Emanuel*

In *Emanuel, supra,* 17 Cal.5th at pages 881–885, our Supreme Court applied the *Banks* and *Clark* standards and considered Senate Bill No. 1437's statutory amendments in reviewing a resentencing petition filed under section 1172.6. After conducting a " 'fact-intensive, individualized inquiry' " (*Emanuel*, at p. 883) of a failed daytime robbery resulting in the victim's death, the court concluded that a finding that the defendant acted with reckless indifference to human life was not supported by substantial evidence, and accordingly directed that the defendant's murder conviction be vacated. (*Id.* at pp. 875, 883, 896.)

Although *Emanuel* in large part reiterated prevailing law, it also provided further instruction on the analysis required for review of a section 1172.6 petition, specifically as to the reckless indifference prong. The court observed that " '[t]he degree of risk to human life is crucial to the analysis.' " (*Emanuel, supra*, 17 Cal.5th at p. 884.) " ' "Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to

12

establish reckless indifference to human life; "only knowingly creating a 'grave risk of death' " satisfies the statutory requirement.' " (*Ibid.*)  Thus, participating in a typical armed robbery—where reckless indifference is shown only by a coparticipant's use of a gun—is not enough.  (*Ibid.*)

*Emanuel* applied the " 'nonexhaustive list of considerations' " set out in *Clark* for "distinguishing those who knowingly engage in criminal activities known to carry a grave risk of death from other felony perpetrators," noting that " ' "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient," ' " and that "[t]he 'totality of the circumstances' must be analyzed to determine whether the defendant acted with reckless indifference."  (*Emanuel, supra,* 17 Cal.5th at pp. 884–885.)

Consistent with prevailing law, *Emanuel* applied the applicable principles to the facts of the case, reviewing the denial of the defendant's section 1172.6 petition for substantial evidence.  (*Emanuel, supra,* 17 Cal.5th at p. 885.)  As is standard, the court reviewed the record " ' " ' "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact" ' " ' could find beyond a reasonable doubt that [the defendant] acted with reckless indifference."  (*Ibid.*)

**B.    Analysis**

In keeping with *Emanuel*, we review the denial of appellant's section 1172.6 petition for substantial evidence, considering the facts relevant to the reckless indifference determination as counseled by *Banks*, *Clark*, and *Emanuel*. Based on the totality of the circumstances and applying the

13

relevant factors, we conclude that substantial evidence supports the superior court's conclusion that appellant acted with reckless indifference to human life as a major participant in the attempted robbery of Shield.

###     1.     Use of or awareness of the presence of weapons and knowledge of cohort's likelihood of killing

There is no question that appellant was aware of the presence of the weapon and knew that it would be used to commit armed robberies.  Indeed, as the superior court found, appellant set the whole criminal enterprise in motion by supplying the weapon that was used in all four of the robberies as well as the attempted robbery which resulted in Shield's murder.  The weapon was a big "scary" gun that "looked like an Uzi."  It had a magazine containing at least 17 live rounds, and the court reasonably inferred that appellant knew the gun was loaded. Both men handled the gun prior to the murder, passing it back and forth between them.   The evidence clearly shows that, after appellant came up with a "proper gun" that he and Watkins could use to "jack some people," they jointly planned to use the gun to commit robberies.

There is a significant overlap between being a major participant and acting with reckless indifference to human life. (*Clark, supra,* 63 Cal.4th at p. 615 [" 'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life' "].)  Appellant did not only know that a gun would be used in the robberies.  He supplied the gun and intended for it to be used, as planned with Watkins.  These facts contrast sharply with *Emanuel*, where there was " 'no evidence in the record demonstrating that, prior to the robbery, Emanuel knew [the killer] possessed a gun, would

bring that gun to the robbery, or "was likely to use lethal force." ' " (*Emanuel, supra,* 17 Cal.5th at p. 885.)

Moreover, substantial evidence supports the conclusion that appellant was aware of the likelihood that Watkins was willing to use the gun to kill. During the first robbery, Watkins used the gun to strike Orosco on the temple, without any provocation, and before Orosco had even spotted him. Watkins then continued to point the gun at Orosco. Shortly afterward, Watkins pointed the still-loaded gun directly at Muhammed as they robbed him. It can reasonably be inferred that, after appellant witnessed and participated in these violent and dangerous incidents, he was aware that continuing on a course of armed robberies was likely to result in escalation to the point of shooting and killing, particularly if the victim offered any resistance.

Appellant's conduct following the attempted robbery and murder of Shield provides additional support for the superior court's ruling. "[A] defendant's conduct following the use of lethal force may be reflective of his or her mental state during the offense." (*Emanuel, supra,* 17 Cal.5th at p. 893.) After Shield was shot, appellant did not abort the plan to commit a series of armed robberies. Instead, he drove around until the pair identified their next victim. Appellant may have personally held the still-loaded gun in the robbery of Lee. At a minimum, he helped devise a plan to use the gun to rob Lee and was an active participant in the encounter. Appellant's actions do not reflect the mental state of a person surprised by the fact that the robbery of Shield had resulted in a shooting and probable death. Rather, appellant's conduct demonstrates that he was willing to accept murder as an acceptable and foreseeable cost of the armed

15

robbery spree he had set in motion, reflecting a reckless indifference to human life.

### 2. Duration of the crime

The attempted robbery of Shield was relatively short in duration. After appellant and Watkins popped the hood of the truck and pretended to look inside at the engine, Watkins lured Shield over by waving at him. Shield stood with the two for about a minute before hurrying away. Watkins shot Shield shortly thereafter, just before appellant sped away.

The brief duration of this attempted robbery, however, does not weigh strongly in appellant's favor. Shield was shot out of fear that he was going to call the police. (See *People v. Mitchell* (2022) 81 Cal.App.5th 575, 594 (*Mitchell*) [duration of the crime was brief, not because the defendant showed compassion or regard for the victim, but because the frightened victim tried to flee].)

Moreover, the attempted robbery of Shield must be considered in the context of the hours-long crime spree. Appellant had ample time to seek to minimize violence prior to the encounter with Shield. He failed to do so, and after the Shield murder, appellant once more participated in a potentially lethal robbery.

### 3. Efforts taken to minimize the risk of violence

In *Emanuel*, the court noted that the subject robbery was planned to occur at 2:30 p.m., in a public park, where witnesses were likely to be present. (*Emanuel, supra,* 17 Cal.5th at p. 887.) The defendant was unaware that his confederate would be carrying a gun. (*Id.* at pp. 885, 887.) These facts were relevant to the determination of whether the defendant made efforts at the planning stage to minimize the risk of violence. (*Id.* at pp.

16

887–888.)  Similarly, in *Scoggins*, the subject confrontation took place in a public parking lot during the daytime, and the defendant did not intend that weapons be used.  (*Scoggins, supra,* 9 Cal.5th at p. 683.)  And in *Clark* the defendant planned that a robbery would take place after business hours, with few employees present, and involve only one unloaded gun.  (*Clark, supra*, 63 Cal.4th at pp. 621–622.)

In contrast, appellant actively sought out locations that he and Watkins believed would provide a good opportunity to rob someone.  They specifically chose the Holiday Inn for this purpose.  It was still dark outside when appellant pulled into the Holiday Inn parking lot.  Shield and his family were the only people present.  Moreover, appellant certainly knew that the attempted robbery would involve a loaded gun, as he procured the weapon and passed it back and forth with Watkins throughout their crime spree.  Appellant actively participated in each robbery, and joined in the deception which drew Shield to the truck to facilitate robbing him.

Appellant had opportunities throughout the series of crimes to minimize the risk of violence but did not do so.  He jointly planned to use the "proper gun" to "jack some people."  He did not unload the gun, warn Watkins that it was loaded, or caution Watkins not to shoot anyone.  Instead, appellant's planning reflected the mindset of a person fully contemplating the possibility that the gun would be used to shoot a victim, and the record does not indicate that he did anything to minimize this possibility.

### 4. Physical presence at the scene and opportunity to restrain confederates or aid victims

Appellant was physically present and actively participated in the attempted robbery that resulted in the fatal shooting of Shield. Appellant hurried with Watkins to the front of the truck and opened the hood to make it appear that they had engine trouble. Watkins waved to Shield, drawing Shield over to the truck and away from his family. As soon as Shield began to rush back toward his family, appellant and Watkins closed the hood and hurried to get back into the truck, fearing that Shield was going to call the police. With the passenger door still open, one foot hanging outside the vehicle, and facing outward, Watkins fired the gun at Shield, who was only about four or five steps away. The truck then immediately took off, tires screeching, with appellant at the wheel. The passenger door closed as the truck started to peel away.

This attempted robbery and shooting of Shield was, as noted, just one in a continuing series of violent felonies committed by appellant and Watkins. " 'Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the [co]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, "the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting

18

murders." ' " (*Emanuel, supra,* 17 Cal.5th at p. 889, quoting *Clark, supra,* 63 Cal.4th at p. 619.)

In contrast to *Emanuel,* where the defendant "attempted to act as a restraining influence," "saying 'let's go,' " and began walking away from the robbery (*Emanuel, supra,* 17 Cal.5th at p. 91), appellant facilitated the attempted robbery that led to Shield's death. It is true that, based on the evidence, appellant likely could not have physically interceded at the exact moment Watkins took aim and fired at Shield. (See *Emanuel,* at p. 892 ["failure to restrain a cohort" "cannot be said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so"].) Unlike in *Emanuel,* however, appellant had plenty of forewarning that his cohort was willing to use the loaded gun in a violent manner, and he had abundant opportunity prior to the shooting to prevent that from happening. Watkins did not fire the gun in a sudden burst of anger or in the midst of a physical confrontation, but instead shot Shield as he attempted to walk away, just as he had struck Orosco in the temple without provocation.

As counseled by *Emanuel,* appellant's act of fleeing following the shooting and his failure to render aid to Shield does not, in itself, lead to the conclusion that he acted with reckless indifference to human life. (See *Emanuel, supra,* 17 Cal.5th at p. 894 [circumstances of the defendant's flight made it difficult to determine frame of mind concerning the victim's death].) But, unlike in *Emanuel,* where "it could be inferred that [the defendant] was motivated to flee the scene as quickly as possible" only for the purpose of evading arrest (*ibid.*), the evidence in this case showed that appellant wished not only to avoid arrest, but

19

also to hurry on to his next armed robbery. (See *ibid.* ["postflight conduct may shed light on a defendant's state of mind"].)

Appellant asserts that the evidence provides no indication that he knew Watkins would shoot at Shield, relying on Watkins's trial testimony that, immediately after the shooting, appellant said, "What the fuck you doing?" and Watkins responded that he shot Shield by accident. Watkins's testimony regarding the events surrounding the shooting of Shield, however, can at most be accorded minimal weight, since the testimony was effectively rejected by the jury. In addition to the testimony relied on by appellant, Watkins also testified that he and appellant never intended or attempted to rob Shield, that he angrily told Shield that they did not want his help which caused Shield to hurry away, and that he accidentally shot Shield only because he used the same hand he was holding the gun with to close the truck door. Despite these claims, the jury found appellant and Watkins guilty of the first degree murder and attempted robbery of Shield, and found true the allegation that the murder of Shield occurred while appellant and Watkins were engaged in the commission of armed robbery. It is clear from the jury's verdict that it found Watkins's testimony not credible, and there is no basis for us to accord the testimony greater weight now.

### 5. Appellant's youth

Appellant was 18 years old when he committed the string of robberies that resulted in the murder in this case. In his initial briefing in this appeal, appellant argued that the superior court erred in failing to consider his "cognitive development and the hallmark features of youth" in determining whether he acted with reckless indifference to human life. Appellant repeats this

argument, in truncated form, in his supplemental brief. We previously concluded that the superior court's possible failure to consider appellant's youth at the time of the offense did not require remand. *Emanuel* does not compel us to find otherwise.

A number of appellate courts have considered whether and to what extent a defendant's relative youth—which various statutes refer to as being under the age of 26 (§§ 3051, subd. (a)(1), 4801, subd. (c))—is relevant to assessing whether a defendant has satisfied the subjective component of the reckless indifference test. These courts have reached the general consensus that the defendant's age at the time of the offense is an additional factor a court may consider in determining whether the defendant acted with reckless indifference to human life. (See, e.g., *People v. Harris* (2021) 60 Cal.App.5th 939, 960 (*Harris*); *In re Moore* (2021) 68 Cal.App.5th 434, 439 (*Moore*); *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990–991 (*Ramirez*); *Mitchell, supra*, 81 Cal.App.5th at p. 595; *In re Harper* (2022) 76 Cal.App.5th 450, 468–470 (*Harper*); *People v. Keel* (2022) 84 Cal.App.5th 546, 558–559 (*Keel*); *People v. Jones* (2022) 86 Cal.App.5th 1076, 1091–1093 (*Jones*); *People v. Oliver* (2023) 90 Cal.App.5th 466, 488–489 (*Oliver*); *People v. Pittman* (2023) 96 Cal.App.5th 400, 416–418 (*Pittman*).)

In *Emanuel*, the defendant argued that his youth at the time of the offense was a relevant factor in assessing whether he acted with reckless indifference to human life. (*Emanuel, supra*, 17 Cal.5th at p. 885, fn. 6.) The Supreme Court declined to address this claim on the basis that the defendant failed to make this argument to the lower courts, and because it concluded that the evidence was otherwise insufficient to support a finding of reckless indifference to human life. (*Ibid.*)

21

Appellant likewise failed to raise this claim in the superior court, despite relative youth being a widely recognized factor by the time of the November 4, 2022 evidentiary hearing on appellant's section 1172.6 petition. *Harris, supra*, 60 Cal.App.5th 939, the first case on this issue, was decided on February 16, 2021, nearly two years before the hearing in this case. After Harris, at least five other cases—all decided before November 2022—held that youth is a relevant factor in the reckless indifference analysis: *Moore, supra*, 68 Cal.App.5th 434 (decided Aug. 31, 2021), *Ramirez, supra*, 71 Cal.App.5th 970 (decided Nov. 23, 2021), *Mitchell, supra,* 81 Cal.App.5th 575 (decided July 22, 2022), *Harper, supra,* 76 Cal.App.5th 450 (decided Mar. 17, 2022), and *Keel, supra,* 84 Cal.App.5th 546 (decided Oct. 21, 2022).

The hearing in this case occurred well after numerous opinions held that a defendant's youth should be considered as part of the reckless indifference inquiry. In general, we presume the superior court knew and applied the relevant law in exercising its duties. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042 ["Absent evidence to the contrary, we presume that the trial court knew the law and followed it"].) Substantial evidence supports the implied finding that appellant's youth did not override the strong evidence demonstrating appellant's reckless indifference to human life.

But even if the superior court did not consider the factor of youth in its reckless indifference analysis, we find any error harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Oliver, supra*, 90 Cal.App.5th at p. 489, fn. 8 [applying *Watson* harmless error analysis]; *Pittman, supra*, 96 Cal.App.5th at pp. 417–418 [same].) There is no evidence in the trial record that

22

suggests appellant lacked the maturity to act with reckless indifference to human life. To the contrary, the evidence showed appellant to be a mature young man, who was married and had loving relationships with his wife and stepson, and who was described as a "[v]ery good worker."

Significantly, appellant's conduct prior to and during the crime spree did not demonstrate an immaturity that would suggest he was incapable or hindered in his capacity to consider the consequences of his actions. As the court in *Oliver* explained, "[T]he case law discussing the differences in brain development among youthful offenders (in contrast to their adult counterparts) stress two areas of divergence: (1) their relative impulsivity; and (2) their vulnerability to peer pressure." (*Oliver, supra*, 90 Cal.App.5th at p. 489.) Here, there is nothing to indicate appellant's participation in this crime spree was due to peer pressure, nor did the evidence suggest he behaved "like an immature, naïve, or impulsive adolescent." (*Harper, supra*, 76 Cal.App.5th at p. 472.) As explained, appellant was an equal participant in the calculated plan to scour the area for easy victims and rob them of their money using the loaded weapon supplied by appellant himself. Nothing in the plan or its execution reflected the impulsiveness or pliability of youth.

While "[y]outh can distort risk calculations," we also recognize that "[t]he fact of youth cannot overwhelm all other factors." (*Mitchell, supra*, 81 Cal.App.5th at p. 595.) As set forth above, the factor of appellant's youth was outweighed by other factors demonstrating his reckless indifference to human life. Accordingly, we conclude that any error in the superior court's possible failure to consider appellant's youth was harmless.

### 6. Totality of the circumstances

Considering each of the above factors, and weighing the totality of the circumstances, we conclude that the superior court did not err in finding that appellant acted with reckless indifference to human life. The attempted robbery of Shield, part of an extended crime spree using the loaded gun supplied by appellant—which was wielded to threaten, harm, or kill in the numerous confrontations on the day of the murder—presented risks greater than those " 'inherent in any armed robbery.' " (*Emanuel, supra,* 17 Cal.5th at p. 896.) Moreover, after Shield was shot and killed, appellant simply continued on to the next armed robbery, reflecting a state of mind motivated only by the desire to commit robbery and an acceptance that murder could likely result.

In sum, considering the totality of the circumstances, substantial evidence supports the conclusion that appellant " ' "knowingly creat[ed] a ' "grave risk of death." ' " ' " (*Emanuel, supra,* 17 Cal.5th at p. 884.)

## DISPOSITION

The order denying appellant's petition for resentencing under Penal Code section 1172.6 is affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

CHAVEZ, J.

RICHARDSON, J.